Gary S. Thompson (*pro hac vice pending*)
Email: gthompson@reedsmith.com
Jan A. Larson (*pro hac vice pending*)
Email: jlarson@reedsmith.com
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C.  20005-3373
Telephone:     +1 202 414 9200
Facsimile:     +1 202 414 9299

Melissa A. Meth (SBN 263571)
Email: mmeth@reedsmith.com
REED SMITH LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071
Reception: +1 (213) 457-8000
Fax: +1 (213) 457-8080

Attorneys for Plaintiff LMA North America, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LMA NORTH AMERICA, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>Defendant. | Case No.:  **'11 CV1282 WQH POR**<br><br>**COMPLAINT FOR:**<br><br>1) BREACH OF CONTRACT<br>2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>**JURY TRIAL DEMANDED** |

This is a diversity action, pursuant to 28 U.S.C. § 1332 (a), on behalf of Plaintiff, LMA North America, Inc. ("LMA"), by and through its undersigned counsel, against Defendant, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and in support thereof, Plaintiff alleges as follows:

– 1 –

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1. This action arises out of National Union's failure to meet its insurance coverage obligations to LMA regarding certain counterclaims brought against LMA and subsequently settled between the underlying parties in the action *The Laryngeal Mask Company Ltd., et al. v. AMBU A/S, et al.*, CASD Case NO. 07cv1988 DMS (NLS).

## PARTIES

2. Plaintiff LMA is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 4660 La Jolla Village Drive, San Diego, California 92122.

3. Defendant National Union is a corporation organized and existing pursuant to the laws of Pennsylvania, with its principal place of business at 175 Water Street, 18th Floor, New York, New York 10038. National Union is licensed to transact, and did transact, business in the State of California at all times relevant to this Complaint with LMA, and upon information and belief, other entities.

4. National Union is part of the Chartis Group of insurance companies, formerly known as the American International Group of insurance companies ("AIG").

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over National Union by virtue of its business activities within California.

7. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391, as a substantial portion of the events giving rise to this Complaint occurred, and continue to occur, in San Diego, California.

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DEMAND FOR JURY TRIAL

# FACTUAL ALLEGATIONS

**The Policy**

8. National Union issued Policy No. BE 3205963 (the "National Union Policy" or the "Policy") to LMA as the Named Insured for policy period January 1, 2004 through January 1, 2005, with per occurrence excess limits of $14 million. (A true and accurate copy of the Policy is attached as Exhibit A hereto).

9. The National Union Policy is excess to Transcontinental Insurance Company ("Transcontinental") Policy No. A1081632676 issued to LMA as the Named Insured for the same policy period, with per occurrence primary limits of $1 million.

10. National Union is obligated under its Policy to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury, or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world." . . . ." *Id*. at Sec. IV.I and End. No. 2.

    a. LMA is an "Insured." *Id*. at Sec. IV.E.

    b. The "Retained Limit" is the equivalent of the applicable limit of the underlying policy issued by Transcontinental, *i.e.*, $1 million. *Id*. at Sec. III.E.

    c. "Advertising Injury" includes "injury arising solely out of [LMA's] advertising activities as a result of one or more of the following offenses: 1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." *Id*. at Sec. IV.A.

    d. "Personal Injury" includes any other injury, other than "Advertising Injury," arising out of "4. Oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services…" *Id*. at Sec. IV.I & End. No. 2.

e.   "Occurrence" means, "as respects Advertising Injury, an offense committed in the course of advertising [LMA's] goods, products or services that results in Advertising Injury," and "as respects Personal Injury, an offense arising out of [LMA's] business that results in Personal Injury."  In either case, "All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants."  *Id*. at Sec. IV.H.

11.   Before the underlying Transcontinental policy is exhausted, National Union has "the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, it [its] opinion, may create liability on [its] part . . . ."  *Id*. at Sec. II.C.

12.   National Union has "the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:  1. The applicable Limits of Insurance of the underlying policies . . . have been exhausted by payment of claims to which this policy applies."  *Id*. at Sec. I.A.1.

**The Underlying Litigation**

13.   LMA and Ambu, Inc. ("Ambu") distribute competing laryngeal mask airway products.  From 2004 to 2009, LMA made certain claims in its advertising and marketing materials regarding the safety and reliability of Ambu's products.

14.   On October 15, 2007, LMA brought a patent infringement suit against Ambu, captioned *The Laryngeal Mask Company Ltd., et al. v. AMBU A/S, et al.* (S.D.Cal. Case No. 3:07-cv-01988-DMS-NLS).

15.   On August 25, 1988, Ambu filed seven counterclaims against LMA for (i) non-infringement; (ii) invalidity; (iii) violation of the Lanham Act § 43(a) for allegedly false and disparaging statements in advertising regarding Ambu's products; (iv) false advertising under California Business and Professions Code § 17500 premised on the same allegedly false and disparaging statements in advertising; (v) trade libel under California Civil Code § 45 premised on

– 4 –

the same allegedly false and disparaging statements in advertising; (vi) intentional interference with prospective economic relations premised on the same allegedly false and disparaging statements in advertising; and (vii) unfair competition under California Business and Professions Code § 17200 premised on the same allegedly false and disparaging statements in advertising.

16. Ambu's first two counterclaims were, in effect, affirmative defenses re-stated as counterclaims. Counterclaims three through seven, to the extent they allow for an award of monetary damages, are referred to herein as the "Product Disparagement Counterclaims."

17. Specifically, Ambu alleged in its Product Disparagement Counterclaims that from 2004 to 2009, LMA made certain claims in its advertising and marketing that implied Ambu's products were unsafe or inferior to LMA's products, and Ambu thereby claimed entitlement to certain monetary damages.

**Tender of the Claim to Transcontinental and National Union**

18. Ambu's Product Disparagement Counterclaims against LMA are covered "Advertising Injury" or "Personal Injury" under the Transcontinental and National Union Policies.

19. Therefore, LMA notified its primary insurer, Transcontinental, of the Product Disparagement Counterclaims and tendered to Transcontinental the defense and potential indemnity (up to $1 million) for the Product Disparagement Counterclaims.

20. Transcontinental agreed to defend LMA against the Product Disparagement Counterclaims, subject to a reservation of rights regarding indemnity coverage. Transcontinental stated that its 2004 policy was triggered, with all defense fees or indemnity amounts relating to product disparagement activity from 2004-2009 being part of the same "occurrence" and relating back to the 2004 policy limit for adjustment and policy limit purposes.

21. LMA also notified National Union of the Product Disparagement Counterclaims since there was a potential for an indemnity in excess of the $1 million primary limit.

22. National Union delayed in stating any coverage position to LMA but eventually, on September 30, 2009, issued a letter to LMA acknowledging a "potential" for coverage under its excess policies (including the 2004 policy year), subject to a reservation of rights if and when the underlying $1 million limit were exhausted.

**Provision of Information to Transcontinental and National Union**

23. At all times, from 2009-2011, LMA diligently provided to Transcontinental and National Union substantial amounts of information regarding the underlying suit and the Product Disparagement Counterclaims, including but not limited to all information required by the policies, copies of pleadings and discovery, verbal reports from LMA defense counsel, and access to electronic repositories of information maintained by LMA's defense counsel.

24. At all times, National Union had the right and opportunity to participate in the defense of the Product Disparagement Counterclaims, including during the time that Transcontinental conducted the defense. National Union elected, however, to have little or no involvement in the defense of the Product Disparagement Counterclaims, deferring to the activities of LMA and Transcontinental.

25. National Union did not complain or assert at any relevant time any prejudice regarding the timing or volume of LMA's notice or information to National Union regarding the Product Disparagement Claims.

26. On or about June 30, 2009, the district court granted partial summary judgment in favor of Ambu that three of four Ambu product lines did not infringe the LMA patent. On or about September 25, 2009, the district court granted summary judgment in favor of Ambu for invalidity of the LMA patent, effectively dismissing all of LMA's affirmative claims for patent infringement. The court also denied LMA's motion for summary judgment regarding the Product Disparagement Counterclaims, leaving only Ambu's Product Disparagement Counterclaims to be decided by a jury. The district court thereafter stayed, but did not dismiss, consideration of the Ambu Product Disparagement Counterclaims, pending LMA's appeal on its patent claims.

27. On September 21, 2010, the Federal Circuit Court of Appeals reversed the dismissal of the LMA patent claims. The action was remanded to the district court for adjudication of LMA's patent claims and Ambu's Product Disparagement Counterclaims.

28. On December 10, 2010, Ambu sent LMA a written settlement demand for its Product Disparagement Counterclaims for $28 million, including 14 pages of factual and legal analysis; the demand was shared with Transcontinental and National Union.

**Mediation and Contingent Settlement in Principle**

29. LMA and Ambu agreed to mediate their respective disputes, scheduled for January 10 and 11, 2011. Well in advance, Transcontinental and National Union were invited to attend and participate with authority to contribute to a settlement.

30. National Union unreasonably declined the invitation, affirmatively choosing to exclude itself from the mediation in which LMA and Ambu (and the mediator) would exchange views regarding the Product Disparagement Counterclaims.

31. On January 10 and 11, 2011, the mediation proceeded between LMA and Ambu (with Transcontinental in attendance). On January 11, 2011, LMA defense counsel provided an update by telephone to National Union, including Ambu's arguments regarding its entitlement to damages and the exchange of numbers between Ambu and LMA respecting the Product Disparagement Counterclaims that would otherwise be determined in a jury trial.

32. At the mediation, LMA and Ambu could not and did not reach a settlement because LMA's insurers, Transcontinental and National Union, declined any settlement authority or approval at that time. LMA and Ambu only reached a contingent settlement in principle for a payment by LMA to Ambu of $4.75 million for the Product Disparagement Counterclaims if LMA could secure a commitment by its insurers to fund that settlement amount (or if LMA otherwise waived such contingency).

33. LMA and Ambu agreed upon this contingent settlement number of $4.75 million (down from Ambu's $28 million demand) based on a thorough, arms-length, and adversarial mediation and compromise process, as guided by a neutral mediator. The contingent settlement amount of $4.75 million was and is a fair and reasonable amount in light of all the facts and circumstances of the underlying litigation, including LMA's exposure in a jury trial to damages in excess of such amount.

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DEMAND FOR JURY TRIAL

34. On February 1, 2011, LMA forwarded to National Union a copy of the agreed term sheet for the settlement agreement in principle (which agreement was not yet then finalized), with a request for review, discussion, and approval thereof. Thereafter, various additional materials were provided by LMA to National Union, including the mediation presentations and estimates of defense costs through trial (over $2.7 million at the capped rates allowed by Transcontinental).

35. On February 3, 2011, LMA sent National Union the then current draft of the settlement agreement, received February 2, 2011, and invited any revisions that National Union might propose.

36. On February 14, 2011, National Union sent LMA a letter requesting certain information, including an analysis from LMA's defense counsel on the issues of liability and damages. In its letter, National Union misrepresented various facts, including deliberate and out-of-context quotations allegedly stated to National Union by LMA defense counsel. After a long period of ignoring the case, declining to attend the mediation, and delaying consideration of the proposed settlement, National Union's request for more information was unreasonable at the time it was made.

37. LMA attempted to expedite matters on February 17, 2011 by offering National Union a conference call with LMA's defense counsel to discuss openly the liability and damages analysis, and again requested National Union's approval of the settlement agreement in principle.

38. On February 18, 2011, National Union responded, insisting on a written analysis of liability and damages from LMA defense counsel. National Union stated that LMA defense counsel was in the "best position to provide such an assessment," affirming that National Union would defer to the written analysis of LMA defense counsel regarding the reasonableness of a $4.75 million settlement for the Product Disparagement Counterclaims.

39. At this time, National Union and its counsel had access to LMA defense counsel's database containing all relevant underlying information, and could have conducted such analysis on its own.

40. On March 14, 2011, Transcontinental confirmed that it was willing to pay its full $1 million primary limit towards the $4.75 million settlement.

41. On March 17, 2011, LMA notified National Union that Transcontinental had agreed in writing to pay its policy limits of $1 million, thereby exhausting the primary layer of coverage and giving National Union the options of (1) accepting the settlement (and paying its $3.75 million share), or (2) accepting the defense (along with Transcontinental's $1 million to hold for future settlement discussions). LMA renewed its request that National Union approve the settlement in principle and contribute $3.75 million of its excess policy limits.

42. On March 21, 2011, LMA also provided National Union with the requested, detailed written analysis from LMA's defense counsel that was in the best position to opine regarding the proposed $4.75 million settlement. Defense counsel concluded that the proposed settlement was fair and reasonable in light of all relevant factual and legal risk analysis.

43. LMA requested National Union's reply by March 29, 2011, with time of the essence in order to finalize the settlement with Ambu.

44. On March 25, 2011, with National Union still silent, LMA sent National Union a detailed letter setting forth the chronology of events and requesting that National Union either (1) approve the settlement in principle, or (2) reject the settlement in principle and itself assume the defense of the Product Disparagement Counterclaims (since at that point Transcontinental was willing to tender its $1 million limit, to National Union if necessary, and thus no longer defend the claim). LMA properly and reasonably claimed that if National Union would accept neither the settlement nor the defense, LMA would have the right to complete the settlement, pay the full $4.75 million to Ambu, and then pursue reimbursement of the $3.75 million from National Union.

45. On Friday, March 25, 2011, National Union sent a new list of questions for LMA defense counsel from its coverage litigation counsel, regarding the defense counsel settlement analysis. The timing of this information request was unreasonable.

46. On Tuesday, March 29, 2011, LMA defense counsel sent a detailed written reply to National Union coverage counsel's questions. This was followed by a conference call wherein LMA and its coverage counsel had the full opportunity to question further LMA defense counsel.

47. In that call, LMA reiterated its requests that National Union either approve the settlement in principle, or reject the settlement in principle and assume the defense of the underlying suit (with Transcontinental's $1 million).

48. National Union continued to delay its reply, past March 29, 2011 and past the resumption of underlying litigation activity on April 4, 2011.

49. National Union took until April 7, 2011 to reply, and unreasonably and arbitrarily refused either to approve the settlement or assume the defense of the Product Disparagement Counterclaims. National Union's letter contained misstatements and out-of-context quotations asserted to be made by LMA defense counsel, and almost no substantive analysis of the reasonableness of the $4.75 million settlement in principle. In taking a litigious posture, National Union failed in its duty to fairly and promptly evaluate the proposed settlement.

50. On April 13, 2011, LMA continued its attempts to engage National Union in further discussions, once again requesting that National Union either (1) approve the settlement and pay its $3.75 million share; or (2) reject the settlement and accept the defense of the underlying suit along with Transcontinental's $1 million in limits. LMA indicated that rejection of either option would constrain LMA to settle with Ambu, pay the $4.75 million, and thereafter seek the $3.75 million excess share in a subsequent coverage action with National Union.

51. National Union did not respond to LMA's further attempts to engage National Union, falling silent.

52. On April 14, 2011, LMA sent another letter to National Union, asking again for a reply, and reiterating the three clear outcomes: (1) approve the settlement and pay $3.75 million; (2) reject the settlement but accept the defense, with Transcontinental's $1M in pocket to fund any future settlement; or otherwise (3) LMA would proceed to settle and debate the reasonableness of the settlement in a subsequent coverage action. LMA specifically recited that LMA would proceed to complete the settlement on April 15, 2011 (a Friday) or early the following week.

53. National Union did not reply, thereby confirming its prior rejection of either the settlement or the defense. On April 18, 2011, after waiting for a response from National Union for

1  as long as possible, LMA was forced to finalize the settlement with Ambu. The total settlement for
2  the product disparagement claims was $4.75 million.

3        54.    LMA promptly notified National Union of the final settlement and the exhaustion of
4  the primary layer of coverage and continued to request that National Union contribute the remaining
5  $3.75 million out of its excess layer of coverage.

6        55.    It was not until April 21, 2011, several days later, that National Union responded,
7  rejecting the settlement after-the-fact, and for the first time, offering to assume the defense of the
8  underlying suit. By that time, it was too late for National Union to assume the defense of the action,
9  as the settlement had been finalized and executed. National Union suggested that LMA somehow
10 "undo" the final settlement with Ambu.

11       56.    LMA responded the same day, April 21, 2011, reiterating that the settlement had
12 been finalized and could not be "undone," such that National Union's after-the-fact willingness to
13 take on the defense was too late. LMA stated that National Union had been notified of the pending
14 settlement and its options numerous times prior to the settlement being finalized. LMA also noted
15 its belief that National Union had acted in bad faith in its handling of the defense and indemnity of
16 this matter, including by deliberately waiting until after the settlement to suddenly state a willingness
17 to take on the defense as a pretext to creating a bogus defense of failure by LMA to gain National
18 Union's "consent" to the settlement.

19       57.    While no longer relevant, National Union and its counsel continue to have, and still
20 have, full access to the LMA defense counsel database in order to conduct, or assist any of its
21 consultants in conducting, further analysis of the case and the reasonableness of the now finalized
22 $4.75 million settlement paid to Ambu.

23       58.    National Union has refused to reimburse LMA for the $3.75 million National Union
24 share of the settlement (in excess of the $1 million paid in full by Transcontinental).

25       59.    National Union is legally obligated to pay LMA $3.75 million, which amount is
26 covered under the National Union Policy, in breach of its obligations to LMA, and to the financial
27 damage of LMA.
28

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING; DEMAND FOR JURY TRIAL

## FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

60. LMA hereby incorporates by reference the above paragraphs 1 through 59 as if fully set forth herein.

61. National Union committed substantial and material breaches of its contractual obligations to LMA by wrongfully refusing to indemnify LMA for $3.75 million of the reasonable $4.75 million settlement of the underlying Product Disparagement Counterclaims, and refusing to assume the defense of the continued action until after the settlement had been finalized.

62. LMA complied with all of the terms and conditions of the National Union Policy and performed all other required conditions and obligations under the National Union Policy.

63. Alternatively, LMA is excused from compliance with the terms and conditions of the National Union Policy, and/or National Union is estopped to assert any terms, conditions, or exclusions of the National Union Policy.

64. As a result of the foregoing, National Union breached its contract with LMA in the following respects, among others:

    a. Failing to promptly investigate the claim;

    b. Failing to objectively investigate the claim;

    c. Unreasonably and wrongfully denying indemnity;

    d. Unreasonably and wrongfully refusing to participate and cooperate in mediation and settlement negotiations between LMA and Ambu;

    e. Withholding policy benefits while knowing they were due and payable; and

    f. Delaying the handling of LMA's claim.

65. As a direct and proximate result of National Union's breaches of the National Union Policy, LMA suffered substantial monetary damages totaling $3.75 million.

66. LMA has also incurred, continues to incur, and will in the future incur attorney's fees and expenses to prove its entitlement to coverage under the National Union Policy. National Union is liable to LMA for all such fees and expenses.

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DEMAND FOR JURY TRIAL

67. As a direct, foreseeable, and proximate result of National Union's breach of contract, LMA suffered damages including, but not limited to damages alleged above, attorney's fees, interest on all damages suffered, and other losses, according to proof at trial.

## SECOND CLAIM FOR RELIEF – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

68. LMA hereby incorporates by reference the above paragraphs 1 through 67 as if fully set forth herein.

69. In every contract of insurance, including without exception the National Union Policy, there is an implied covenant of good faith and fair dealing, that the insurance company will do nothing to interfere with the right to receive benefits under the National Union Policy, that the insurer will give at least as much consideration to the interests of the insured as it does its own interests, that the insurer will exercise diligence, good faith, and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage (hereinafter referred to as the "covenant of good faith and fair dealing").

70. National Union owes to LMA a duty of good faith and fair dealing implicit in the National Union Policy.

71. National Union breached the implied covenant of good faith and fair dealing under the National Union Policy, by *inter alia*:

    a. Unreasonably and wrongfully refusing to participate and cooperate in mediation and settlement negotiations between LMA and Ambu;

    b. Unreasonably and arbitrarily withholding consent to the settlement;

    c. Unreasonably refusing to take over the defense after Transcontinental exhausted its policy limits;

    d. Forcing LMA to institute litigation to recover amounts due to LMA under the National Union Policy;

    e. Failing to give LMA's interests equal consideration with its own interests.

72. As a proximate result of National Union's breach of the implied covenant of good faith and fair dealing under the National Union Policy, LMA has been damaged in that it has been forced to directly pay approximately $3.75 million to settle its liability with Ambu, and has not been reimbursed by National Union for its damages incurred in connection with the underlying litigation. Additionally, LMA has sustained and will continue to sustain attorney's fees and costs in prosecuting this coverage action against National Union.

73. In breaching the implied covenant of good faith and fair dealing, National Union has acted in a manner knowingly harmful to and/or in conscious disregard of the rights of LMA, reflecting malice and/or oppression as defined in California Civil Code Section 3294, and with deliberate intent to vex, injure, and annoy LMA so as to deprive it of its rights under the National Union Policy. Such conduct warrants the imposition of punitive and exemplary damages in an amount sufficient to punish and make an example of National Union in order to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, LMA prays that the Court enter judgment against National Union as follows:

WITH RESPECT TO THE FIRST CLAIM FOR RELIEF:

1. the amount of $3.75 million for National Union's breach of contract;
2. pre-judgment and post-judgment interest;
3. attorneys fees and costs;
4. all other costs of the suit herein;
5. other compensatory damages in an amount to be proven at trial;

WITH RESPECT TO THE SECOND CLAIM FOR RELIEF:

6. all of the above requested relief, and additional punitive or exemplary damages in an amount to be determined at trial; and
7. such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of any and all issues so triable.

DATED:  June 10, 2011

REED SMITH LLP

By  /s/ Melissa Meth
    Gary S. Thompson
    Jan A. Larson
    Melissa A. Meth
    Attorneys for Plaintiff LMA North America, Inc.