# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LMA NORTH AMERICA, INC., | CASE NO. 11cv1282-WQH-DHB |
| Plaintiff, | ORDER |
| vs. | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment or, Alternatively, Partial Summary Judgment ("Motion for Summary Judgment"), filed by Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). (ECF No. 24).

## I.     Background

On June 10, 2011, Plaintiff LMA North America, Inc. ("LMA") initiated this action by filing a Complaint in this Court against National Union. (ECF No. 1). In connection with National Union's refusal pay $3.75 million toward the settlement of an underlying litigation pursuant to an umbrella insurance policy, LMA asserts two claims for relief: (1) breach of contract, and (2) breach of the implied covenant of good faith and fair dealing ("bad faith claim"). Plaintiff seeks punitive damages as to the bad faith claim, and has demanded a jury trial.

On September 12, 2012, National Union filed the Motion for Summary Judgment,

accompanied by evidence. (ECF No. 24). National Union moves the Court for summary judgment as to the entire Complaint or, alternatively, partial summary judgment as to LMA's bad faith claim and request for punitive damages.

On October 1, 2012, LMA filed an opposition to the motion, accompanied by evidence. (ECF No. 26). On October 5, 2012, National Union filed a reply. (ECF No. 27). On February 8, 2012, the Court conducted oral argument on the Motion for Summary Judgment. (ECF No. 36).

## II.     Facts

### A.     Ambu Litigation

Plaintiff LMA and LMA's main competitor, Ambu A/S ("Ambu"), distribute competing laryngeal mask airway products.[1]  (Def. Ex. 8 at 59, ECF No. 24-3 at 60).

On October 15, 2007, LMA brought a patent infringement suit against Ambu related to certain laryngeal mask airway products, captioned *The Laryngeal Mask Company Ltd., et al. v. AMBU A/S, et al.*, (S.D. Cal. Case No. 3:07-cv-01988-DMS-NLS) (the "Ambu Litigation"). (Def. Ex. 1 at 10, ECF No. 24-3 at 5).

On August 25, 2008, Ambu filed five product disparagement counterclaims against LMA in the Ambu Litigation. (Def. Ex. 4 at 16, ECF No. 24-3 at 17). These counterclaims were premised on allegedly false and disparaging statements in LMA advertising regarding Ambu's laryngeal mask airway products. Specifically, Ambu alleged that from 2004 to 2009, LMA made certain claims in its advertising and marketing that implied Ambu's products were unsafe or inferior to LMA's products, and Ambu thereby claimed entitlement to resulting monetary damages (the "Counterclaims").

On September 25, 2009, the district court in the Ambu Litigation granted summary judgment in favor of Ambu for invalidity of the LMA patent, effectively dismissing all of LMA's affirmative claims for patent infringement. (Def. Ex. 7 at 53-57, ECF No. 24-3 at 54-58). On September 25, 2009, the district court denied LMA's motion for summary judgment

---

[1]  "[L]aryngeal mask airway devices ... are artificial airway devices used to deliver anesthetic gases during surgery and to establish unobstructed airways in patients in emergency situations." (Def. Ex. 8 at 58, ECF No. 24-3 at 59).

as to Ambu's Counterclaims and denied LMA's motion to exclude Ambu's damages expert pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Pl. Ex. 1 at 1-2, ECF No. 26-1 at 4-5).  On October 6, 2009, the district court stayed all further proceedings pending LMA's appeal of the summary judgment order as to LMA's patent infringement claim.  (Pl. Ex. 2 at 1-4, ECF No. 26-1 at 6-10).

On September 21, 2010, the Court of Appeals for the Federal Circuit reversed the dismissal of the LMA patent claims.  (Def. Ex. 8 at 63, ECF No. 24-3 at 64).  The action was remanded to the district court for adjudication of LMA's patent infringement claims in conjunction with Ambu's Counterclaims.  *Id.*

## B. National Union Policy

Defendant National Union issued Policy No. BE 3205963 (the "Policy") to LMA, with per occurrence excess limits of $14 million.[2]  (Def. Ex. 9 at 79-126, ECF No. 24-3 at 80-127).  The National Union Policy is excess to CNA Policy No. A1081632676 issued to LMA by nonparty CNA, with per occurrence primary limits of $1 million.  National Union is obligated under its Policy to "pay on behalf of the Insured those sums in excess of the Retained Limit [$1 million] that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of ... Personal Injury, or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world." *Id.* at 81, 102-03, ECF No. 24-3 at 82, 103-04.  The parties agree that Ambu's product disparagement Counterclaims against LMA are covered "Advertising Injury" or "Personal Injury" under the CNA and National Union Policies.  (ECF No. 24-1 at 7; ECF No. 26 at 9).

Prior to exhaustion of CNA's primary coverage, National Union has "the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in [its] opinion, may create liability on [its] part...." (Def. Ex. 9 at 82, ECF No. 24-3 at 83).  Following exhaustion of the CNA policy, National Union has "the right and duty to defend any claim or suit seeking damages covered

---

[2] The parties agree that the Policy was in effect at all relevant times.

by the terms and conditions of this policy when ... [t]he applicable Limits of Insurance of the underlying policies ... have been exhausted by payment of claims to which this policy applies." *Id*. at 81, ECF No. 24-3 at 82.

The Policy contains the following "no voluntary payments" provision: "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [National Union's] consent." *Id*. at 93, ECF No. 24-3 at 94. The Policy also contains the following "no action" clause: "There will be no right of action against us under this insurance unless: ... 2. The amount you owe has been determined with our consent or by actual trial and final judgment." *Id*.

### C.    LMA's Notification to National Union

On March 13, 2009, LMA notified National Union of Ambu's Counterclaims. (Manger Decl. ¶ 6, ECF No. 24-4 at 3).

On July 14, 2009, CNA agreed to defend LMA under the primary policy in the Ambu Litigation with respect to the Counterclaims. *Id*. ¶ 10, ECF No. 24-4 at 3.

On September 14, 2009, LMA forwarded to National Union a September 11, 2009 letter from Ambu, whereby Ambu's counsel stated that "LMA's potential exposure [as to Ambu's Counterclaims] is ... well in excess of $30 million." (Manger Dep. 61-62, 65, ECF No. 26-3 at 73-74; Pl. Ex. D, ECF No. 26-3 at 121).

On September 30, 2009, National Union sent a coverage letter to LMA, whereby National Union stated "there is potential coverage under the National Union Polic[y], subject to a reservation of rights." (Manger Decl. ¶ 11, ECF No. 24-4 at 4; Def. Ex. 16 at 114, ECF No. 24-4 at 115).

On October 9, 2009, LMA defense counsel informed a National Union claims handler that the Ambu Litigation would most likely be stayed pending LMA's appeal to the Federal Circuit. (Def. Ex. 11 at 60, ECF No. 24-4 at 61). LMA gave National Union access to a "database of the docket sheet and all entries on the docket" of the Ambu Litigation. (Pl. Ex. D at 119, ECF No. 26-3 at 124). National Union "typically follows PACER [a database allowing access to all public filings in a federal court case] to keep track of filings in [a] case"

1  such as the Ambu Litigation.  (Manger Dep. at 74-75, ECF No. 26-3 at 77).

2        On August 30, 2010, LMA's counsel, Stephen Marzen, forwarded to National Union's

3  claims handler, Louis Manger, a detailed case report concerning the Ambu Litigation.  (Pl. Ex.

4  D at 119, ECF No. 26-3 at 124).

5        On November 15, 2010, LMA's counsel Marzen spoke with claims handler Manger.

6  The claim notes written by Manger state:

> On 11/15/10, I spoke with defense counsel Stephen Marzen regarding the
> remaining claims.  According to defense counsel, the cross claim for false
> advertising is a [']bargaining chip' that has no support based upon the evidence
> adduced thus far.  Therefore defense counsel does not recommend any payment
> to settle the cross claim at this point.  The parties are attempting to schedule a
> mediation to resolve the outstanding claims.  Defense counsel thinks that it is
> likely, given everyone's schedule, that this mediation will take place in January.

11  (Def. Ex. 11 at 45, ECF No. 24-4 at 46).

12        In his April 27, 2012 deposition in this case, Marzen stated: "[W]e characterized [the

13  Ambu Counterclaims as] a bargaining chip.  At the same time, it plainly was not merely a

14  bargaining chip, because the claim, having survived summary judgment motions, was more

15  than a chip at that point [because it was going to go to trial]."  (Marzen Dep. at 53-54, ECF No.

16  26-3 at 19-20).  Marzen stated:

> Well, I'm an advocate for LMA and on the product disparagement claims for the
> insurance companies, too.  So I actually thought that we had good arguments,
> very good arguments.  By the same token, for every argument we had, Ambu
> had counterarguments, and as discussed with [Manger], the unfortunate fact was
> all of our arguments were put in summary judgment motions, and the judge
> denied them all.  So we were then faced with trying them in front of a jury.

21  *Id.* at 38-39, ECF No. 26-3 at 16.

22        On November 16, 2010, National Union claims adjuster Manger reported in his claim

23  notes that he was called by "the underlying CNA adjuster."  (Def. Ex. 11 at 45, ECF No. 24-4

24  at 46).  Manger states: "While [the CNA adjuster] is still reviewing deposition transcripts,

25  preliminarily, [CNA] does not intend to pay[] on the claim at this point and do[es] not think

26  they will attend the mediation [in the Ambu Litigation].  Nevertheless, it was agreed that

27  [CNA] would provide us with the mediation date when it is scheduled."  *Id.*

28        On November 17, 2010, Marzen emailed Manger with information about the upcoming

mediation, including proposed dates, and asked, "Are you available to attend...?"  (Pl. Ex. F

at 167, ECF No. 26-3 at 172).

On November 29, 2010, Manger responded that "National Union did not plan on attending the upcoming mediation unless the primary carrier (CNA) planned on contributing its $1,000,000 primary limits to settle Ambu's counterclaim." (Manger Decl. ¶ 13, ECF No. 24-4 at 4). Marzen "voiced no objection to National Union's position regarding the upcoming mediation." *Id.*

On December 2, 2010, Manger spoke to the CNA claims adjuster. In his claim notes, Manger stated as follows: "[CNA has] not been given a demand and [CNA was] not considering, at this time, ... put[ing] up [its] policy limits. Accordingly, I informed [the CNA claims adjuster] that [National Union] will not be attending the upcoming mediation. It was agreed that CNA would keep us up to date on the happenings at the mediation." (Def. Ex. 11 at 41, ECF No. 24-4 at 42).

On December 16, 2010, LMA forwarded to National Union a copy of Ambu's December 10, 2010 pre-mediation settlement demand for its Counterclaims, which was then $28 million, including 14 pages of factual and legal analysis and voluminous attachments. (Manger Dep at 105-110, ECF No. 26-3 at 84-85; Pl. Exs. G & H, ECF Nos. 26-3 at 197-205, 26-4 at 1-78). Ambu's December 10, 2010 pre-mediation letter states that Ambu's expert economist "estimates that Ambu has sustained actual damages of at least $9,862,847, and alternatively at least $12,376,090 under an unjust enrichment theory." (Pl. Ex. G at 196, ECF No. 26-3 at 201). The letter states that "Ambu will establish additional facts at trial" that "will expose LMA to enhanced damages (up to three times the amount of actual damages)." *Id.*

On January 5, 2011, Manger stated in his claim notes:

> The Federal Circuit denied Ambu's rehearing petitions.... Accordingly, the appeal is over and the case is remanded to the San Diego federal court with LMA's patent claims restored. Ambu's product disparagement counter claim will also be tried. LMA's counsel also indicates that the chairman of Ambu's board of directors is planning to attend Monday's mediation. As we have not received any indication that the underlying carrier is considering any settlement amount, much less offering up its policy limits, we do not intend to appear at the mediation. Nevertheless, I have asked LMA's counsel to keep me updated as the mediation proceeds.

(Def. Ex. 11 at 40, ECF No. 24-4 at 41).

1

**D.    Mediation**

2        On January 10-11, 2011, the mediation proceeded without National Union present.

3  (Marzen Dep. at 174-75, ECF No. 26-3 at 50).

4        On the afternoon of January 10, 2011, Manger sent Marzen an email asking if there

5  were "[a]ny significant developments."  (Pl. Ex. R at 345, ECF No. 26-5 at 50).  Marzen

6  responded on January 10, 2011 with an email stating that "[t]he parties have not yet exchanged

7  demands and offers."  *Id*.  Marzen continued: "As you know, CNA is represented here by its

8  coverage counsel.  If CNA is willing to tender its policy limits, is [National Union] willing to

9  participate?"  *Id*.

10        Later in the afternoon of January 10, 2011, the CNA claims adjuster sent Manger an

11  email relaying a report she had received from CNA's coverage counsel at the mediation.

12  CNA's claims adjuster stated:

13        LMA is putting a substantial price on the counterclaim and would like to get
          [CNA]'s $1M limit.  [LMA's coverage counsel] noted that the parties will talk
14        in terms of a net settlement to LMA (i.e., $20M for the patent, and $10M for
          disparagement, netting LMA $10M). [CNA's coverage counsel] discussed the
15        fact that he didn't want LMA to over value the disparagement claim....

16        A little later, [LMA's coverage counsel] advised that he thought [LMA]'s
          opening offer would be to have [Ambu] pay it $16M on the patent claims and
17        agree to pay [Ambu] $1M on the disparagement claims, subject to [CNA]'s
          approval.  (We have not offered anything.  Please call me should you want to
18        discuss this.)

19        [CNA] asked [LMA to] prepare a liability and damages analysis of the
          disparagement portion of the case.
20

21  (Pl. Ex. P at 341, ECF No. 26-5 at 46).

22        On the morning of January 11, 2010, Marzen called Manger with a detailed update of

23  the first day of the mediation.  (Marzen Dep. at 60-61, ECF No. 26-3 at 21).  During the call,

24  Marzen told Manger that "further exchange of numbers on the second day of the mediation ...

25  would necessarily be in the excess insurer's layer."  *Id*. at 62, ECF No. 26-3 at 22.  Manger

26  "accurately played back to [Marzen] all of the arguments in [LMA's] summary judgment

27  motions."  *Id*.  Marzen responded that, "as good as we ... thought our argument was, the judge

28  without a written opinion has denied our summary judgment motion.  So those arguments ...

aren't going to stop this product disparagement counterclaim from getting to a jury."  *Id*. at 63,

ECF No. 26-3 at 22.  At the end of the call, Manger told Marzen that LMA did not have authority to settle from National Union.  *See id*.  Marzen also did not have authority to settle from CNA.  *See id*.

During the second day of the mediation, "offers and counter-offers went back and forth throughout the course of the ... day," and, "at midnight, there was a tentative term sheet" agreed to by the parties.  *Id*. at 64, ECF No. 26-3 at 22.

On January 13, 2011, Manger stated in the claim notes:

> Mediation was conducted and ended without a resolution on January 11, [2011]. CNA did [not] make an offer much less agree to offer up its policy limits. However, according to LMA's counsel, CNA was considering doing so when faced with a potentially expensive trial. I spoke with LMA's counsel and asked him to prepare a budget for legal services going forward and including trial.

(Def. Ex. 11 at 39, ECF No. 24-4 at 40).  Manger understood that "the mediation ended without any settlement," and "the primary insurer, CNA, did not make any settlement offer at the mediation."  (Manger Decl. ¶ 16, ECF No. 24-4 at 4-5).

**E.      Settlement**

On February 1, 2011, LMA's coverage counsel sent an e-mail to Manger.  According to Manger:

> This e-mail advised that, contrary to my prior understanding, LMA and Ambu had indeed reached a tentative settlement on January 11, 2011. [LMA's] e-mail attached a settlement 'terms sheet' which indicated that Ambu tentatively agreed to pay $8.75 million to LMA in connection with LMA's patent claims. The 'terms sheet' further indicated that LMA had tentatively agreed to pay $4.75 million to Ambu in connection with Ambu's counterclaim for false advertising and product disparagement. [LMA's coverage counsel] gave no explanation for the three week delay in advising National Union of the tentative settlement.

(Manger Decl. ¶ 17, ECF No. 24-4 at 5).  LMA's coverage counsel asked Manger to review the attached "Agreement in Principle" and then contact LMA's coverage counsel.  (Def. Ex. 17 at 134, ECF No. 24-4 at 135).

The "Agreement in Principle" signed by LMA and Ambu on January 11, 2011, stated that the settlement payments (payment by Ambu to LMA of $8.75 million, and payment by LMA to Ambu of $4.75 million) were expressly conditioned on LMA's ability to obtain "a written unconditional commitment ... by LMA['s] primary and umbrella insurance carriers ... to reimburse LMA [] for the amount paid to Ambu....  If LMA does not certify the fulfillment

of the Condition by February 18, 2011 ... or otherwise waive the Condition ... then this Agreement in Principle becomes null and void." (Def. Ex. 17 at 136, ECF No. 24-4 at 137).

On February 2, 2011, LMA sent Manger LMA's and Ambu's mediation presentations. (Manger Dep at 134-135, ECF No. 26-3 at 92). On February 3, 2011, LMA sent Manger "a memo and [budget] estimate that [LMA] sent to the trial team to organize [LMA's] preparation for trial." (Pl. Ex. K at 287, ECF No. 26-4 at 87). The budget from LMA estimated that the defense fees and costs through the end of trial would be a total of $2,759,968.75 (including $2,008,025 in fees related to Ambu's Counterclaims). (Manger Dep. at 124-25, 214-15, ECF No. 26-3 at 89, 107; Pl. Ex. I at 285, ECF No. 26-4 at 85). On February 3, 2011, CNA sent Manger "the last case analysis and subsequent e-mail with regards to the [Federal Circuit] appellate ruling." (Pl. Ex. L at 290, ECF No. 26-4 at 90).

On February 14, 2011, Manger responded to the February 1, 2011 e-mail from LMA's coverage counsel. Manger stated:

> As for LMA's demand that National Union fund $3.75 million of the $4.75 million tentative settlement of Ambu's cross-claims, National Union requires more information before it can respond. Indeed, National Union has never received any evidence or analysis from LMA indicating that the value of Ambu's cross-claims against LMA is significant, let alone that it might exceed the $1 million primary limit. In fact, I spoke to Stephen Marzen on November 15, 2010 specifically regarding the value of Ambu's cross-claims. At that time, he told me that Ambu's cross-claims were being used as a 'bargaining chip' and that Ambu had failed to present competent or sufficient evidence of casually related injury and damages. Indeed we understand that Ambu's own internal surveys undermine its claim that it was damaged as a result of the statements contained in LMA's pamphlet. LMA's recent demand that National Union pay $3.75 million toward a settlement of these same claims suggests that there has been a radical change in LMA's valuation of Ambu's claims. Yet, National Union has received no explanation from LMA regarding this sudden change.
>
> Under the circumstances, National Union requires additional information before it can respond to LMA's demand, including the following: ... [a]n updated analysis of liability .... [and] [a]n analysis of damages for each of the causes of action alleged by Ambu against LMA....
>
> National Union continues to reserve its rights under the terms, conditions and exclusions of the policies.... None of the acts of National Union's agents ... should be construed as a waiver or estoppel against National Union.

(Def. Ex. 19 at 174, ECF No. 24-4 at 175).

On February 17, 2011, LMA's counsel sent an e-mail to Manger which stated:

You have all of Ambu's product in this regard – its mediation statement and

demand letters effectively constitute a liability and damages analysis. The tentative settlement of Ambu's product disparagement counterclaims is a relatively small fraction of Ambu's damages demands.... LMA could create, at this point, a new liability and damages analysis for Ambu's counterclaims.... [T]here is a possibility that such a highly privileged & confidential document could become discoverable by Ambu.... We suggest, as a quicker and better substitute, a simple conference call discussion.... We request National Union's decision whether to fund the $3.75 million in settlement dollars by tomorrow.

(Def. Ex. 20 at 177, ECF No. 24-4 at 178).

On February 18, 2011, Manger sent LMA's counsel an e-mail which stated:

What National Union requires is an even-handed assessment from its insured, LMA. Since LMA's defense counsel has been defending this case from the beginning, National Union believes that he is in the best position to provide such an assessment....

National Union continues to reserve its rights under the terms, conditions and exclusions of [the Policy].... None of the acts of National Union's agents ... should be construed as a waiver or estoppel against National Union.

(Def. Ex. 21 at 181, ECF No. 24-4 at 182).

LMA and Ambu agreed to extend the February 18, 2011 deadline in the LMA-Ambu contingent settlement in order to allow more time for CNA and National Union to consider the settlement. (Marzen Dep. at 120-21, ECF No. 26-3 at 36-37).

On February 18, 2011, Manger sent an e-mail to Marzen, which stated: "[National Union] has retained its own counsel to examine and evaluate the settlement proposal. I would like them to be able to access all confidential discovery." (Pl. Ex. M at 334, ECF No. 26-5 at 38). Marzen responded on the same day allowing National Union's counsel access to the LMA defense database. *Id.* at 333, ECF No. 26-5 at 37.

On March 17, 2011, LMA's counsel sent an e-mail to Manger stating that CNA had "agreed to pay its policy limits of $1 million, conditioned only on a release by Ambu re its product disparagement claims." (Def. Ex. 23 at 186, ECF No. 240-4 at 187). Attached to the e-mail was a memorandum dated March 7, 2011 from LMA's counsel "addressing LMA's potential liability exposure to the product disparagement claims, as requested." *Id.* LMA's counsel stated:

We kindly ask for a reply from [National Union] by Tuesday, March 29, regarding its participation to fund the other $3.75 million. LMA and Ambu have extended their time to finalize the settlement.... However, April 4 is, I believe, the latest date for resumption of litigation activity (expiration of the time to file

1    cert.), so time is scarce.

2    *Id.*

3        On March 23, 2011, LMA's counsel sent Manger an e-mail stating that he "want[s] to

4    make sure that this is being considered by [National Union] with all due attention." (Pl. Ex.

5    N at 336, ECF No. 26-5 at 40).

6        On March 24, 2011, Manger responded with an e-mail which stated: "We are evaluating

7    your response [of March 17, 2011] and will get back to you shortly." *Id.* Manger directed

8    further inquiries to National Union's coverage counsel. *See id.*

9        On March 25, 2011, LMA's counsel sent National Union's counsel a letter setting forth

10   the chronology and stating:

11       At this point, please note that time is of the essence with regard to this
         settlement. If the settlement is unachievable due to National Union disapproval,
12       the underlying litigation activity may commence the week of April 4, 2011.
         Please note that National Union will be responsible for all defense fees and costs
13       going forward (LMA has taken and will take care to separate its bills for defense
         of the counterclaims from pursuit of the affirmative damages for patent
14       infringement).

15       Please be advised that LMA reserves all of its rights ... in this matter, including
         but not limited to the following: .... [T]he right to accept the underlying
16       settlement, pay the $4.75 million to Ambu, and pursue reimbursement of the
         $3.75 million from National Union in litigation.
17
     (Def. Ex. 26 at 11, ECF No. 24-5 at 12).
18
         On March 25, 2011, National Union's counsel e-mailed a letter to LMA's counsel,
19
     which stated: "[W]e are in the process of reviewing and evaluating the Memorandum [dated
20
     March 7, 2011]. However, during the course of the review, a number of questions have arisen
21
     regarding [LMA counsel]'s analysis of the claims, liability, and proposed settlement of the
22
     LMA Action, which require clarification." (Def. Ex. 25 at 6, ECF No. 24-5 at 7). National
23
     Union's counsel listed six questions regarding the Ambu Litigation and the contingent
24
     settlement. *See id.* at 6-7, ECF No. 24-5 at 8.
25
         On March 29, 2011, LMA's counsel sent Manger a nine-page reply to the six questions
26
     posed by National Union's counsel. (Def. Ex. 28 at 16, ECF No. 24-5 at 17). LMA's counsel
27
     also sent Manger a scheduling notice from the trial court in the Ambu Litigation regarding "an
28
     appeal mandate hearing next Friday, April 8." *Id.* LMA's counsel stated: "We are likely to

1    discuss the schedule for clean-up document discovery, depositions, the pretrial conference, and

2    trial of the patent and product-disparagement claims at the [April 8, 2011] hearing." *Id*.

3         On March 29, 2011, LMA's counsel sent an e-mail to National Union's counsel asking

4    National Union to communicate a reply regarding the contingent settlement by April 1, 2011,

5    and stating that "LMA is in a position of duress," and "after [April 1, 2011], the prejudice [to

6    LMA] would be at a point where the underlying litigation must resume." (Def. Ex. 29 at 27,

7    ECF No. 24-5 at 28).  LMA's counsel stated: "[T]he primary insurer accepts the opinion of

8    defense counsel and has tendered [policy] limits.  If [National Union] scuttles the settlement,

9    one or the other [i.e., CNA or National Union] has to pay the defense costs going forward."

10   *Id*.

11        On March 30, 2011, National Union's counsel sent an e-mail to LMA's counsel which

12   stated that "National Union will make every effort to provide you with a response by Friday

13   [April 1, 2011] regarding the proposed settlement."  (Def. Ex. 30 at 30, ECF No. 24-5 at 31).

14        On April 1, 2011, National Union's counsel sent an e-mail to LMA's counsel which

15   stated:

16        National Union is continuing to carefully review, consider, and evaluate the
          proposed $4.75 million settlement of Ambu's counterclaims.  Unfortunately,
17        although its goal was to have a final answer today, that will not be possible.
          National Union expects to have a final decision regarding the proposed
18        settlement early next week – Wednesday [April 6] at the latest.

19   (Pl. Ex. O at 340, ECF No. 26-5 at 45).

20        On April 7, 2011, Manger e-mailed LMA a letter stating that "National Union cannot

21   consent to the settlement."  (Def. Ex. 24 at 198, ECF No. 24-4 at 199).  Manger stated:

22        The settlement is contrary to the information that National Union has received
          to date, including the report of LMA's own expert which clearly demonstrates
23        that Ambu's alleged damages are speculative....  The primary reason given in
          support of the settlement seems to be that the case will be tried to a jury, and that
24        some evidence exists that may be harmful to LMA's defense of the
          disparagement claim. All of this information was known prior to mediation, and
25        yet Mr. Marzen did not recommend National Union make any contribution
          toward settlement of the disparagement claim at that time.  Instead, LMA
26        referred to the disparagement claim as merely a 'bargaining chip.'  While
          National Union appreciates the risks involved in litigation, we have been
27        provided with no new information explaining the sudden shift from the
          characterization of the disparagement claim as a 'bargaining chip' to a claim
28        worth $4.75 million.

1
2
3
4
5

> Finally, in prior communications, you made reference to the notion that, in the event National Union does not consent to the settlement, National Union would have an obligation to assume the defense of the case because CNA has tendered its limits. This statement is simply not the case. A primary insurer cannot terminate its duty to defend by merely tendering its limits to an excess carrier.... Absent settlement of the disparagement claim, CNA's limits will not be exhausted by payment of a judgment or settlement, and thus CNA would have a continuing duty to defend LMA.

6

*Id.* at 199-200, ECF No. 24-4 at 200-01.

7
8

At his deposition, Manger stated that "it's always a consideration [for National Union to take over the defense] because it's something that we can opt to do." (Manger Dep. at 197, ECF No. 26-3 at 107).

9
10
11
12
13
14
15
16
17
18

On April 11, 2011, LMA's counsel called National Union's counsel and "advised [National Union's counsel] that LMA intended to settle the Ambu Litigation, notwithstanding National Union's decision not to consent to the proposed settlement." (Wagner Decl. ¶ 12, ECF No. 24-5 at 3). LMA's counsel stated that he "believed there was legal authority for his position that National Union was required to: (a) consent to the proposed settlement; (b) step in and defend the Ambu Litigation in place of the primary carrier; or (c) face litigation from LMA." *Id.* During that telephone conversation, LMA's counsel mentioned the case, *Diamond Heights Homeowners Association v. National American Insurance Co.*, 227 Cal. App. 3d 563 (1991). (Wagner Decl. ¶ 12, ECF No. 24-5 at 3).

19
20
21

On April 12, 2011, National Union's counsel e-mailed LMA's counsel and stated: "I have relayed the substance of our discussion to National Union. I will let you know as soon as I have any information to report." (Def. Ex. 33 at 42, ECF No. 24-5 at 43).

22
23

On April 13, 2011, LMA's counsel e-mailed National Union's counsel and stated:

> I will follow up with a more complete letter, but to be clear, LMA has provided [National Union] with three options here:

24

> (1) approve the settlement as reasonable and contribute payment; or

25
26

> (2) reject the settlement and accept the defense of the action (along with CNA's limits) in order to continue litigation and try to negotiate a lower settlement or no settlement; or

27
28

> (3) reject the settlement and reject taking on the defense of the action (along with CNA's limits), in which case, if LMA elects to settle, thereafter debate the reasonableness of the settlement in a subsequent coverage action. *See Diamond Heights*; *Fuller-Austin* [*Insulation Co. v. Highlands Insurance Co.*, 135 Cal.

1    App. 4th 958 (2006)].

2    LMA has exhausted every means to try and engage [National Union] in a
     dialogue, but [National Union] appears to be unwilling to even discuss the
3    matter.  That said, the phone line is open.

4    (Def. Ex. 33 at 41, ECF No. 24-5 at 42).  Manger testified that, at the time, he "kn[e]w what

5    [National Union's] options were."  (Manger Dep. at 202, ECF No. 26-3 at 109).

6        On April 13, 2011, National Union's counsel e-mailed LMA's counsel and stated:

7        The only thing I will quibble with is your suggestion that [National Union] is
         refusing to engage in a dialogue with LMA.  You left me a message on Monday.
8        I returned your call and we had a cordial discussion Monday afternoon during
         which you orally relayed LMA's position regarding this matter.  I have, in turn,
9        relayed that information to [National Union].  It is now only Wednesday.  I have
         confirmed that [National Union] is considering LMA's position.  [National
10       Union] is absolutely not refusing to engage in a dialogue with LMA.

11       I will let you know as soon as I have any information to relay.

12   (Def. Ex. 34 at 44, ECF No. 24-5 at 45).

13       On April 14, 2011, LMA's counsel e-mailed a four-page letter to National Union's

14   counsel, reiterating the "three options" and addressing issues raised in National Union's April

15   7, 2011 letter.  (Def. Ex. 35 at 48-51, ECF No. 24-5 at 49-52).   The letter stated that "LMA

16   can no longer extend to National Union an indefinite amount of time to consider the matter,"

17   and "the $4.75 million settlement ... will likely be executed tomorrow or early next week."  *Id.*

18   at 49, 51, ECF No. 24-5 at 50, 52.  The letter concluded: "LMA has reached out to National

19   Union and its counsel at every stage of this matter, and, continues to do so....  Please [feel] free

20   to call me...."  *Id.* at 51, ECF No. 24-5 at 52.

21       On April 19, 2011, LMA's counsel e-mailed National Union's counsel and stated:

22       Please note that LMA waited on [National Union] as long as it could.  Having
         reached out several times and having not heard back, for over a week, LMA was
23       finally constrained, as of yesterday, to complete the underlying settlement of the
         Ambu product disparagement counterclaims.  The settlement was for $4.75
24       million, as reported and as was reasonable under the circumstances.  CNA[] has
         unconditionally promised to pay the first $1 million, thereby exhausting its
25       limits. LMA continues to request $3.75 million in reimbursement from National
         Union[].  Regrettably, National Union[] has displayed an unwillingness even to
26       discuss the matter, even off-line through counsel.

27   (Def. Ex. 36 at 52, ECF No. 24-5 at 53).

28       On April 21, 2011, National Union's counsel e-mailed an eight-page letter to LMA's

counsel which responded in detail to LMA's April 14, 2011 letter and April 19, 2011 e-mail, and concluded:

> [I]n response to the proposal you made one week ago [i.e., in the April 14, 2011 letter], National Union agrees to take over the defense of Ambu's counterclaims under the Policy. If LMA does not agree, or if LMA has entered into an agreement with Ambu that cannot be undone, then LMA entered into that agreement without National Union's consent, in violation of Condition H of the Policy [i.e., the 'no action' clause].

(Def. Ex. 37 at 62, ECF No. 24-5 at 63).

On April 21, 2011, LMA's counsel e-mailed National Union's counsel and stated:

> Your letter ... purports to accept the defense of this action *after* it has fully settled. I will follow up with a formal response, but wanted to reply the same day. As you know, for months, LMA has been desperately trying to engage National Union in this matter. National Union's formal position was communicated -- a written rejection of any coverage at all of a then-proposed $4.75 million settlement, with no offer to take on the defense of the action.
> ....
> It appears to be the case that National Union deliberately waited in silence refusing to communicate any change in its full denial position, waited until after it received confirmation of the settlement (which had been well notified in advance), and then sent this letter purporting to accept the defense after the fact, complete with an assertion that LMA forfeited coverage by having proceeded with the settlement. This subterfuge is additional evidence of bad faith conduct by National Union. Between counsel, this letter is, to say the least, inexplicable. For example, you might have returned one of my many messages or called me as late as Monday morning and said 'hold on, my client might be interested in taking on the defense.' Rather, there was silence, then a fully executed settlement, and then this letter two days after stating a willingness to undertake the defense.

(Def. Ex. 38 at 63, ECF No. 24-5 at 64).

## III.   Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex*, 477 U.S. at 322-24. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See id.*

**IV.   Breach of Contract**

**A.      Contentions of the Parties**

National Union contends:

> Unlike most insurance cases, there is no dispute regarding whether the underlying claim falls within the scope of the insurance policy. Rather, the question presented here is whether an insurance carrier that accepts coverage under an umbrella policy can be forced to pay for a settlement to which it objects, even though it has a contractual right to reject a proposed settlement and have the claim resolved at trial.
> ....

> Although National Union had a contractual right under the Umbrella Policy to withhold its consent to a settlement and, instead, take its chances at trial, LMA settled the case anyway and now demands that National Union fund $3.75 million of the $4.75 million false advertising and product disparagement settlement. Yet, LMA's settlement of the counterclaim over National Union's objection clearly violated two provisions in the Umbrella Policy: the 'no voluntary payments' provision and the 'no action' clause.... One of the main purposes of both these provisions in the Umbrella Policy is to protect National Union from the type of collusive settlement that appears to have taken place in this case.

> Despite its clear violation of these two policy provisions, LMA relies on a 1991 California Court of Appeal case [*Diamond Heights*] to argue that National Union impliedly waived the 'no action' clause in the Umbrella Policy.... LMA's argument is misplaced.

> First, the case relied on by LMA does not even address the 'no voluntary payments' clause, which LMA has unquestionably violated. Second, while the [*Diamond Heights*] case relied on by LMA discusses an implied waiver of the 'no action' clause, this decision was issued prior to *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1 (1995). In *Waller* – the lead case in California regarding waiver – the California Supreme Court rejected implied or 'automatic' waivers, like the

1   implied waiver now urged by LMA.

2   (ECF No. 24-1 at 7-9).  National Union contends that "facts of the present case are also clearly

3   distinguishable from *Diamond Heights*."  *Id*. at 25.

4   LMA contends:

5       In this precise scenario, under well-settled California law, the policyholder has
        the option to complete the settlement and thereafter bring a coverage action
6       against the excess insurer, where coverage will turn on whether the settlement
        was fair and reasonable under the circumstances.   *Diamond Heights*
7       *Homeowners Assoc. v. National American Ins. Co.*, 227 Cal. App. 3d. 563, 581
        (1991).  As California courts have affirmed, the excess insurer, in this limited
8       scenario, cannot hold up its 'no consent' or 'no action' clauses as an absolute
        veto power over a settlement.
9       ....

10      [M]aterial disputes of fact preclude the Court from resolving a pure legal issue
        as to whether this court should ignore the controlling *Diamond Heights*
11      precedent.  But if that issue were squarely presented, there is no basis for
        National Union to ask this Court to reject that precedent.  National Union's
12      entire argument is built on its argument from one case, *Waller v. Truck Ins.
        Exch.*, 11 Cal. 4th 1 (1995), where the California Supreme Court addressed a
13      completely different and unrelated insurance issue....   National Union's
        argument is that since *Waller* held there had been no waiver in that context, then
14      there can never be a waiver in any context and so somehow *Diamond Heights*
        was implicitly overruled.  National Union's core argument is flawed on many
15      levels – its leap out of *Waller* is untenable, *Waller* says no such thing about this
        scenario or about *Diamond Heights*, and most tellingly, since *Waller*, California
16      courts have reaffirmed *Diamond Heights*.

17  (ECF No. 26 at 6-7).

18  **B.    Discussion**

19  California law governs in this diversity action.  *See Hyundai Motor Am. v. Nat'l Union

20  Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092, 1097 (9th Cir. 2010); *see also Erie Ry. Co. v.

21  Tompkins*, 304 U.S. 64, 71-80 (1938).

22      When interpreting state law, federal courts are bound by decisions of the state's
        highest court.  In the absence of such a decision, a federal court must predict
23      how the highest state court would decide the issue using intermediate appellate
        court decisions, decisions from other jurisdictions, statutes, treatises, and
24      restatements as guidance.  However, where there is no convincing evidence that
        the state supreme court would decide differently, a federal court is obligated to
25      follow the decisions of the state's intermediate appellate courts.

26  *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (quotation

27  omitted).

28  In *Diamond Heights Homeowners Association v. National American Insurance Co.*, 227

Cal. App. 3d. 563 (1991) ("*Diamond Heights*"), a primary insurer sued an excess insurer, seeking contribution toward a stipulated judgment.  In the settled action, an insured developer had been sued for construction defects.  Its primary insurer provided the defense and notified the excess insurer, Central, that settlement demands exceeded primary coverage and that it was likely the primary policy limits would be exhausted.  Defense counsel also notified Central that both its assessment of the repair work and the plaintiffs' settlement demand exceeded primary policy limits, and sought information on Central's position.  Though Central offered to contribute a nominal sum toward settlement, the matter settled on the first day of trial, without Central's contribution and with its objection to the settlement on the record.  *See id*. at 575.

In *Diamond Heights*, Central moved for summary judgment on the ground that the settlement entered without its consent violated the "no action" clause of the policy.  *See id*. at 576.  Central contended that, "absent a demonstration of bad faith, a liability insurer acts within its contract rights whenever it refuses to voluntarily settle a claim and insists on adjudication of the matter on the merits."  *Id*. (citation omitted).  "Central cited the rule that where maximum potential loss does not exceed liability policy limits, the insurer has the absolute right to control the litigation and settlement, because the insured is not subjected to any risk of loss."  *Id*. at 581-82 (citation omitted).  The trial court granted summary judgment in favor of Central, and the California Court of Appeal reversed.  The appellate court framed the dispositive issues as:

> Were the primary insurers entitled to settle the case for an amount which invaded excess coverage without the excess insurer's consent?  Conversely, did the excess insurer have the absolute right under [the policy] to object to and therefore preclude any settlement which invaded excess coverage, even if reasonable and made in good faith, thereby compelling the primary insurer to continue the litigation and provide a defense through trial?

*Id*. at 580.

The *Diamond Heights* court concluded that, subject to certain conditions, "a primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage, and ... the primary insurer may enter into such settlement binding upon the excess insurer without the excess insurer's consent, notwithstanding the 'no action' clause."  *Id.*  The appellate court stated: "Although such holding is in apparent conflict with the 'no action'

clause ..., we conclude the excess insurer *may* waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense." *Id*. at 581. The appellate court stated:

> Consistent with its good faith duty, the excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial, bearing the full costs of defense. A contrary rule would impose ... unnecessary burdens upon the primary insurer and the parties to the action, among others.... It imperils the public and judicial interests in fair and reasonable settlement of lawsuits.

*Id*. at 580-81 (quotation omitted).

The appellate court stated that "[t]he excess insurer is not without a means of avoiding a proposed settlement or challenging a final settlement." *Id*. at 582. For instance, the excess insurer "may voluntarily waive policy provisions such as condition H [providing that the excess insurer shall not be required to assume charge of the defense or settlement of any claim against the insured] and agree to undertake the defense (once the primary insurer tenders its full policy limits) and either conduct its own settlement negotiations or take the action to trial." *Id*. The excess insurer "may also challenge the settlement on the ground of unreasonableness or that it is a product of collusion between primary insurer and insured." *Id*. The appellate court reversed the grant of summary judgment in favor of Central because: "Central did not establish as a matter of law that the primary insurers were required to tender a formal demand that Central undertake the defense before entering into the settlement," and "[t]he record further shows Central's papers filed in support of summary judgment did not dispose of the material factual issue of whether Central waived its rights under [the 'no action' clause], including the issue of whether Central was afforded a reasonable opportunity to undertake the defense prior to the settlement." *Id*. at 583.

National Union contends that "the unique factual circumstances surrounding the settlement on the first day of trial in *Diamond Heights* ... distinguish it from the present situation where the settlement was consummated before a trial date was even set." (ECF No. 27 at 10). However, there is nothing stated in the court's analysis in *Diamond Heights* indicating that the timing of the settlement on the first day of trial had an impact on the court's holding. The court stated, without any discussion of timing, that: "Although such holding is

in apparent conflict with the 'no action' clause ..., we conclude the excess insurer *may* waive

its rights under that clause if it rejects a reasonable settlement and at the same time fails to

offer to undertake the defense." *Diamond Heights*, 227 Cal. App. 3d at 581.  Based upon the

record and the summary judgment standard of review, the factual differences between this case

and *Diamonds Heights* does not render the relevant holding of *Diamond Heights* inapplicable

to this case.

National Union contends that "waiver of the 'no action' clause described in *Diamond*

*Heights* is inconsistent with [California] Supreme Court authority," specifically, *Waller v.*

*Truck Insurance Exchange*, 11 Cal. 4th 1 (1995).  (ECF No. 24-1 at 23).  In *Waller*, in a

different factual context than this case,[3] the California Supreme Court stated:

> Case law is clear that 'waiver is the intentional relinquishment of a known right
> after knowledge of the facts.  The burden is on the party claiming a waiver of a
> right to prove it by clear and convincing evidence that does not leave the matter
> to speculation, and doubtful cases will be decided against a waiver.'  The waiver
> may be either express, based on the words of the waiving party, or implied,
> based on conduct indicating an intent to relinquish the right.

*Id*. at 31 (quoting *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107-08 (1962)); *see also id*. at 33-34

("California courts will find waiver when a party intentionally relinquishes a right or when that

party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable

belief that such right has been relinquished.") (quotation omitted).

*Waller* reiterated waiver principles that existed before *Diamond Heights*.  *See Waller*,

11 Cal. 4th at 31.  *Waller* makes no mention of *Diamond Heights* or the rule stated therein.  A

post-*Waller* California Court of Appeal case has applied the *Diamond Heights* holding in a

context similar to this case.  In *Fuller-Austin Insulation Co. v. Highlands Ins. Co*., 135 Cal.

App. 4th 958 (2006), the appellate court concluded that a reorganization plan approved by a

---

[3]  *Waller* addressed "the automatic waiver rule announced in dictum in *McLaughlin v.*
*Connecticut General Life Ins. Co.*, 565 F. Supp. 434 (N.D. Cal. 1983)."  *Waller*, 11 Cal. 4th
at 32 ("In attempting to predict what this court would do when faced with the waiver issue, the
*McLaughlin* ... court held that an insurance company which  relies on specified grounds for
denying a claim thereby waives the right to rely in a subsequent litigation on any other grounds
which a reasonable investigation would have uncovered.") (quotation omitted).  In *Waller*, the
California Supreme Court stated: "We ... decline to follow the *McLaughlin* rule of automatic
waiver.  A holding that an insurer waives defenses not asserted in its initial denial of a duty to
defend would be inconsistent with established waiver principles by erroneously implying an
intent to relinquish contract rights where no such intent existed."  *Id.* at 33.

bankruptcy court was a settlement which was enforceable against excess insurers without their consent, despite the presence of a policy provision "prohibiting [the insured] from voluntarily settling any claim without the insurer's prior written consent." *Id*. at 982 n.7.   The appellate court examined *Diamond Heights* and stated: "The rationale of *Diamond Heights* applies here. It would impose an unnecessary burden on primary insurers and parties to an underlying action to hold that an excess insurer has an absolute right to withhold its consent to a settlement, while at the same time decline to participate in the action." *Id*. at 987.   The appellate court stated:

> Allowing [the insured] to enter into a global settlement in the bankruptcy court without [the excess insurers]' participation, while permitting [the excess insurers] to challenge the Plan for fairness, reasonableness and lack of fraud or collusion in the instant action, does no violence to the policy language requiring [the excess insurers]' consent.   We do not believe that the policies can be read to permit an excess insurer to hover in the background of critical settlement negotiations and thereafter resist all responsibility on the basis of lack of consent.   Nor, however, do we believe that [the excess insurers] waived all rights under the policies.... On remand, [the excess insurers] will be entitled to litigate the issue of whether, as to them, the Plan is unfair, unreasonable or the product of fraud or collusion.

*Id*. at 990-91 (citing *Diamond Heights*, 227 Cal. App. 3d at 581).   After examining *Diamond Heights*, *Waller*, *Fuller-Austin*, and the other cases cited by the parties, the Court does not find that National Union has provided "convincing evidence that the state supreme court would decide differently" than *Diamond Heights* in this context.   *Vestar Dev. II*, 249 F.3d at 960.

National Union contends that *Diamond Heights* has been "roundly criticized by other California appellate courts."   (ECF No. 24-1 at 23 (citing *Pacific Estates, Inc. v. Superior Court*, 13 Cal. App. 4th 1561, 1572 (1993); *Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 524-25 (1995); *Hartford Accident & Indem. Co. v. Landmark Ins. Co.*, 29 Cal. App. 4th 435, 440, n.4 (1994)).   The criticism of *Diamond Heights* relates to issues not relevant in this case.   *See Fuller-Austin*, 135 Cal. App. 4th at 987 n.11 ("We acknowledge that *Diamond Heights* has been criticized, but this criticism revolves around its further conclusion that Central was bound by the good faith settlement determination as a 'co-obligor.'   Subsequent cases have clarified that an excess insurer is not conclusively bound by a good faith settlement determination in which it did not participate.") (citing *Hartford Accident & Indem. Co.* and

*Pacific Estates, Inc.*).

National Union contends that *Diamond Heights* "makes no mention [of] the 'no voluntary payments' provision." (ECF No. 27 at 11). However, as conceded by National Union, the underlying purpose of both the "no action" clause and the "no voluntary payments" provision are the same. *See* ECF No. 24-1 at 21 ("Like the 'no voluntary payments' provision, 'the purpose of a 'no action clause' is to prevent abuse, collusion and/or fraud against the insurer in the settlement of claims against an insured.'") (quoting *Continental Cas. Co. v. St. Paul Surplus Lines Ins. Co.*, 803 F. Supp. 2d 1113, 1123 (E.D. Cal. 2011)). National Union has presented no reasoned basis to apply the *Diamond Heights* holding differently to a "no voluntary payments" provision than to a "no action" clause. Indeed, in *Fuller-Austin*, the California Court of Appeal applied the *Diamond Heights* holding to an excess policy with a "no voluntary payments" provision. *See Fuller-Austin*, 135 Cal. App. 4th at 982 n.7.

The Court finds, based upon the summary judgment standard of review and solely for the purposes of deciding the Motion for Summary Judgment, that the holding of *Diamond Heights* applies to this case. There are genuine issues of material fact as to whether the settlement of the Ambu Counterclaims was "unreasonable[]," "a product of collusion," and "whether [National Union] waived its rights under [the 'no action' clause and the 'no voluntary payments' provision], including the issue of whether [National Union] was afforded a reasonable opportunity to undertake the defense prior to the settlement." *Diamond Heights*, 227 Cal. App. 3d at 582, 583; *cf. Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 679 (2000) ("Whether there has been a waiver is usually regarded as a question of fact to be determined by the jury....") (quotation omitted)). The Motion for Summary Judgment is denied as to LMA's claim for breach of contract.

## V.    Covenant of Good Faith and Fair Dealing

### A.    Contentions of the Parties

National Union contends:

[U]nder California law, LMA's claim for breach of the implied covenant of good faith and fair dealing ('bad faith') cannot be based on a purported waiver of a policy provision. Rather, the underpinnings of the claim must be a breach of a policy provision. There is no breach here, so there can be no bad faith.

1
2

Moreover, inasmuch as this action arose because National Union sought to reasonably enforce its contractual right to approve any settlement that might invade the limits of the Umbrella Policy, LMA's bad faith claim fails as a matter of law.

3

(ECF No. 24-1 at 9)

4

5

LMA contends:

6
7
8
9
10

[T]here is ample evidence from which a jury could conclude that [National Union] acted unreasonably.... [National Union] refused to meaningfully participate in the defense, mediation, and settlement process, despite LMA's continuous attempts to engage [National Union] and to provide them with relevant information. [National Union] failed to undertake a meaningful analysis of the claims and refused to attend the mediation. Following the contingent settlement, [National Union] dragged its heels for months, forcing LMA to jump through hoops, only at the end of the day to deny perfunctorily any approval.... [I]n many respects, [National Union]'s conduct was in bad faith, designed to deprive LMA of its rights, and malicious. From these facts, a jury could find in LMA's favor.

11

12

(ECF No. 26 at 27).

13

**B.   Discussion**

14

Under California law, "[t]he covenant of good faith and fair dealing has particular

15

application to insurers because they are invested with a discretionary power affecting the rights

16

of another, and the insurance business is affected with a public interest and offers services of

17

a quasi-public nature." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.

18

2002) (applying California law) (citing, inter alia, *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d

19

809, 820 (1979)). "Reflecting the importance of insurers' good faith obligations, bad faith by

20

an insurer is subject to tort remedies, including punitive damages." *Id.* (citation omitted).

21

"The key to a bad faith claim is whether or not the insurer's denial of coverage was

22

reasonable." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (applying

23

California law); *see also Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1073 (2007) ("[I]f

24

the insurer denies benefits unreasonably (i.e., without any reasonable basis for such denial),

25

it may be exposed to the full array of tort remedies, including possible punitive damages.")

26

(citation omitted). "[T]he reasonableness of an insurer's claims-handling conduct is ordinarily

27

a question of fact." *Amadeo*, 290 F.3d at 1161 (citations omitted).

28

National Union relies upon *CalFarm Ins. Co. v. Krusiewicz*, 131 Cal. App. 4th 273

(2005), in contending that "LMA's ... bad faith [claim] ... cannot be based on a purported

waiver of a policy provision." (ECF No. 24-1 at 9). In *CalFarm*, the court held that because an insured's claim for promissory estoppel was not based on the terms of the insurance contract, the insured was not entitled to punitive damages. *See CalFarm*, 131 Cal. App. 4th at 285-86 ("Here, promissory estoppel arises to enforce [a representative of the insurer]'s promise at the settlement conference that [the insurer] would pay the full amount of the arbitrator's award, not to enforce the Policy terms. Since promissory estoppel here was based on a promise independent of the Policy's implied covenant of good faith and fair dealing, estoppel cannot support punitive damages."). In this case, LMA has asserted that National Union's failure to pay LMA's claim constitutes a breach of contract, which distinguishes this case from *CalFarm*. *Cf. id*. at 277 ("The pertinent issue in assessing bad faith is whether [the insurer]'s assessment of coverage under the contract of insurance was objectively reasonable. In contrast, the [insureds]' claim of promissory estoppel was based upon representations made by [the insurer] at a settlement conference regarding an agreement to arbitrate, not the terms of an insurance contract."). In light of the principles announced in *Diamond Heights* and *Fuller-Austin*, as discussed above, a reasonable jury could find that National Union's failure to pay LMA's claim constituted a breach of the insurance contract.

Viewing the evidence in the light most favorable to LMA, a reasonable jury could conclude that National Union acted unreasonably in delaying its response to LMA's request that National Union fund the contingent settlement or take over defense of the Counterclaims. The Motion for Summary Judgment is denied as to LMA's claim for breach of the covenant of good faith and fair dealing.

## VI. Punitive Damages

### A. Contentions of the Parties

National Union contends that "LMA simply cannot prove, with clear and convincing evidence, that National Union engaged in fraudulent, oppressive, or malicious conduct." (ECF No. 24-1 at 9). National Union contends that Louis Manger was not a "managing agent" of National Union and LMA cannot prove that any "improper conduct [by Manger] was authorized or ratified by [National Union] management." *Id*.

LMA contends:

> [National Union] did everything in its power to avoid paying the claim.  It refused to undertake a meaningful analysis of the claim prior to the mediation, refused to attend the mediation, and then found ways to delay its response to the settlement proposal.  It held LMA and the primary insurer hostage for months while it purportedly engaged in the analysis that it should have done before the mediation.  It asked for an analysis of the claim from the person who was in the 'best position' to make an assessment, then it promptly ignored that analysis.  It sought to exercise absolute veto power over the settlement without taking on the defense of the case.  Then, three days after it knew the matter settled, it disingenuously offered to pick up the defense.  These actions go beyond unreasonable to the point that a jury could find [National Union] engaged in malicious and oppressive conduct sufficient to sustain an award of punitive damages.

(ECF No. 26 at 28).  LMA contends that "[b]ecause Mr. Manger exercised substantial discretion over the decision not to pay the claim, a jury could find his actions should be imputed to National Union." *Id*. at 28-29.

## B.    Discussion

"Punitive damages are available if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious." *Amadeo*, 290 F.3d at 1164 (citing, inter alia, Cal. Civ. Code § 3294(a)).  "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).  "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id*. § 3294(c)(2).  "An employer shall not be liable for [punitive] damages ..., based upon acts of an employee of the employer, unless the employer ... authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.  With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id*. § 3294(b).  "[T]he relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior

1  bargaining position.  The availability of punitive damages is thus compatible with recognition
2  of insurers' underlying public obligations and reflects an attempt to restore balance in the
3  contractual relationship." *Egan*, 24 Cal. 3d at 820 (citations omitted).  "'Determinations
4  related to assessment of punitive damages have traditionally been left to the discretion of the
5  jury.'"  *Amadeo*, 290 F.3d at 1165 (quoting *Egan*, 24 Cal. 3d at 821).

6        Viewing the evidence in the light most favorable to LMA, a reasonable jury could find
7  that National Union's actions and inaction, including its delays in responding to LMA's
8  request that National Union fund the contingent settlement or take over defense of the
9  Counterclaims, were motivated by an improper purpose that constituted malice or oppression.
10 Viewing the evidence in the light most favorable to LMA, a reasonable jury could find that
11 Manger, who was the only National Union agent "proactively involved" in "assess[ing]" the
12 claim and "read[ing] any of the underlying documentation" (Manger Dep. at 175-77, ECF No.
13 26-3 at 102), was a "managing agent" of National Union pursuant to California Civil Code §
14 3294(b).  *See Egan*, 24 Cal. 3d at 822-23 ("The determination whether employees act in a
15 managerial capacity ... does not necessarily hinge on their 'level' in the corporate hierarchy.
16 Rather, the critical inquiry is the degree of discretion the employees possess in making
17 decisions that will ultimately determine corporate policy.  When employees dispose of
18 insureds' claims with little if any supervision, they possess sufficient discretion for the law to
19 impute their actions concerning those claims to the corporation.").  The Motion for Summary
20 Judgment is denied as to Plaintiff's request for punitive damages.

21 **VII.   Conclusion**

22        IT IS HEREBY ORDERED that the Motion for Summary Judgment is DENIED.  (ECF
23 No. 24).

24        IT IS FURTHER ORDERED that all remaining dates in the Case Management
25 Conference Order (ECF No. 32) are reset as follows.

26        The parties shall fully comply with the Pretrial Disclosure requirements of Federal Rule
27 of Civil Procedure 26(a)(3) on or before **April 12, 2013**.  Failure to comply with these
28 disclosure requirements could result in evidence preclusion or other sanctions under Federal

Rule of Civil Procedure 37.

Counsel shall meet together and take the action required by Local Rule 16.1(f)(4) on or before **April 26, 2013**.  At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements resulting in simplification of the triable issues.  Counsel shall exchange copies and/or display all exhibits other than those to be used for impeachment.  The exhibits shall be prepared in accordance with Local Rule 16.1(f)(4)(c).  Counsel shall note any objections they have to any other parties' Pretrial Disclosures under Federal Rule of Civil Procedure 26(a)(3).  Counsel shall cooperate in the preparation of the proposed pretrial conference order.

The proposed final pretrial conference order, including objections to the opposing parties' Federal Rule of Civil Procedure 26(a)(3) Pretrial Disclosures shall be filed with the Clerk of the Court, and e-mailed to efile_hayes@casd.uscourts.gov in WordPerfect or Word format, on or before **May 10, 2013**, and shall be in the form prescribed in and in compliance with Local Rule 16.1(f)(6).

The final pretrial conference shall be held on **May 17, 2013**, at 11:00 a.m., in courtroom 14B.

DATED:  February 15, 2013

**WILLIAM Q. HAYES**
United States District Judge